THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| JOHNNY BRICKMAN WALL,<br><br>                   Petitioner,<br><br>v.<br><br>DEVIN BLOOD,<br><br>                   Respondent. | **MEMORANDUM DECISION<br>AND ORDER<br>DISMISSING PETITION<br>WITHOUT PREJUDICE**<br><br>Case No. 4:21-cv-103-DN<br><br>District Judge David Nuffer |

Inmate Johnny Brickman Wall, ("Petitioner") petitions this court for habeas corpus relief, arguing that his conviction by the state of Utah is "in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C.S. § 2254 (2025) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") Respondent's answer asserts that the first, third and fourth claims are procedurally defaulted because they were never fairly presented to the Utah Supreme Court. Respondent concedes that Petitioner's second claim was exhausted but argues that it should be denied because Petitioner fails to show that the state court decision to reject the claim was contrary to or unreasonably applied federal law. Petitioner's Reply counters that all of his claims of ineffective assistance of counsel were exhausted in the state court and that his conviction results in a fundamental miscarriage of justice because new evidence establishes that he is actually innocent of the crime of which he is convicted.

After careful consideration, Petitioner's first, third and fourth claims are procedurally defaulted, and the second claim is denied on the merits. The Petition is therefore dismissed without prejudice.

I. PETITIONER'S ASSERTED GROUNDS FOR FEDERAL HABEAS RELIEF ..................... 2

II. BACKGROUND ...................................................................................................... 3

III. PROCEDURAL DEFAULT ..................................................................................... 15

    A.   Legal Standards for Procedural Default ....................................................... 15

    B.   Petitioner Failed to Exhaust his First, Third and Fourth Claims in State Court ............. 17

    C.   Petitioner's Unexhausted Claims are Procedurally Defaulted ......................... 23

IV. FEDERAL EXCEPTION TO PROCEDURAL DEFAULT ................................... 24

    A.   Legal Standards for Miscarriage of Justice ................................................ 24

    B.   Petitioner Fails to Establish a Fundamental Miscarriage of Justice ............... 26

        1. Petitioner's new DNA evidence ........................................................... 26

        2. Washer woman changes ...................................................................... 29

        3. Miscellaneous evidence of the Victim's instability ............................. 32

IV. PETITIONER FAILS TO ESTABLISH THAT HIS TRIAL COUNSEL WAS
CONSTITUTIONALLY DEFICIENT FOR FAILING TO OBJECT TO THE
PROSECUTION'S CLOSING STATEMENT ........................................................... 34

    A.   Background ................................................................................................ 35

    B.   Legal Standard ......................................................................................... 37

    C.   Analysis .................................................................................................... 38

V. CONCLUSION ....................................................................................................... 40

## I. PETITIONER'S ASSERTED GROUNDS FOR FEDERAL HABEAS RELIEF

Petitioner's habeas petition (the "Petition") seeks federal habeas relief on four claims that his trial counsel deprived him of his Sixth Amendment right to representation:

    1.      Trial counsel failed to independently test DNA evidence using TrueAllele testing

         procedures. (ECF No. 1, at 29-34);

2. Trial counsel failed to object to statements made during the Prosecution's closing statement. *Id*. at 34-42;

3. Trial counsel failed to rebut the prosecution's theory of Petitioner's guilt by calling Dr. Peter Speth as a witness. *Id*. at 43-56;

4. Trial counsel failed to introduce evidence showing that the victim sometimes deviated from her normal morning routine, that her neighbors' window provided an unobstructed view of the victim's home and that the victim had once taken medicine which had "knocked [her] out." *Id*. at 56-63.

## II. BACKGROUND

Petitioner was convicted of murdering his former spouse, Uta von Schwedler. At trial, DNA evidence linking Petitioner to the crime was inconclusive, but the prosecution presented extensive circumstantial evidence of Petitioner's guilt. The Utah Court of Appeals provided the following summary of the background, investigation and proceedings:

*Marriage and Divorce*

In 1988, a mutual friend introduced Uta to Wall while they were each completing doctorate programs on the west coast. Wall and Uta married in 1990, and Wall graduated from medical school four years later. After medical school, Uta, Wall, and their newborn son moved to Utah for Wall's residency program. Over the next few years, they had three more children together.

By 2005, the marriage had failed and Uta moved out of the family home, leaving the four children to live primarily with Wall. The couple divorced in 2006.

Wall and Uta responded differently to the divorce. According to their children, Wall was "very, very sad" and depressed after the divorce, but over time his mood changed from sadness to "anger, even hatred" toward Uta. Wall frequently complained to the children about Uta, saying that she was "a bad parent," that she was "selfish," and that she made his "life difficult." The children said that Wall never treated Uta "nicely or kindly" after the divorce. At one point, Wall "physically removed" Uta from his property when she "tried to come in the front yard" to pick up the children for her parent time.

Most people who knew Wall knew that he "despised" Uta. He asked his friends, "Would it be bad if Uta wasn't here anymore?" and "How would my life be if she weren't around?" He sent emails to Uta accusing her of immoral acts and threatening to "move away" with the children "or continue towards obtaining full custody." He blamed Uta for his unhappiness and accused her of "hurt[ing] people

that matter deeply" to him. When she reached out to him regarding requests from the children's friends for weekend trips, he asked her to "please stop inserting [herself] in [his] parent time."

It was clear that Wall did not want Uta in the children's lives. The summer before her death, Wall took the children to California but refused to tell them when they were returning to Utah because he did not want them to tell Uta. If the children attempted to communicate with Uta while they were with Wall, "he would become very upset" and would sometimes take their phones away from them. He was uncooperative with Uta regarding parent-time exchanges and adjustments to the custody arrangement. Wall frequently ignored Uta's messages, and she had to organize parent-time schedules through her older children.

Uta's response to the divorce was quite different. Her friends, family, coworkers, and other acquaintances who testified at trial knew Uta to be "very outgoing, very friendly, very cheerful," and "full of life." Those witnesses said her positive attitude continued after the divorce, and some people "certainly thought she was happier" after the divorce. She was welcoming to newcomers and frequently brought homemade treats to work or to social gatherings. She regularly engaged in physical activities such as swimming, running, hiking, skiing, and camping. Uta was in a "very happy" relationship with a man (the boyfriend) whom the children liked, and the two eldest children told family members that they "were so happy that Uta had [the boyfriend]" because he was "a really, really good match for Uta." No witness testified that Uta was unhappy or suicidal, except for Wall.

Uta was very involved in her children's lives. Although she "had a great love and passion for science," she arranged with her supervisor to work a "30-hour work week" because "it was important to her to be available for [her children] after [school] hours." "Uta's greatest pleasure in life was the love of her four children," and she wanted to spend more time with them. She attended their sporting events and musical performances and created photo albums for each of them.

One of the few things that upset Uta was attempting to work with Wall regarding the children. A few years after the divorce, Uta hired an attorney to file a petition to modify the divorce decree regarding parent time, and the court ordered mediation. Although Wall and Uta reached an agreement during mediation, Wall later refused to sign the proposed order. Thus, for years following the divorce, the custody arrangement was never sorted out and remained a "constant battle."

Early in September 2011, after years of unsuccessfully attempting to work out a better custody arrangement outside of court, Uta reached out to her attorney to discuss filing a new petition to modify the divorce decree and to consider moving to appoint a custody evaluator. Wall ignored Uta's inquiries related to the children, including whether he would either agree to sign the custody evaluation request or agree to the proposed parent-time schedule for the upcoming school year. He also frequently ignored his own attorney's communications related to these requests. The week before Uta's death, in an apparent change of course, Wall agreed to sign the custody evaluation request the following week. But after he left the children in Uta's care for the weekend, Wall "excited[ly]" told a new acquaintance that "he was getting his kids back."

*Uta's Final Days*

The week before her death, Uta had made a discovery in her research that could advance a new treatment for childhood leukemia. According to her supervisor, the "long-term implications of that discovery" were "very exciting on a professional level, on a career level, both for Uta and ... the lab, because [it would] lead[ ] to new peer reviewed publications, grants, [and] presentations." This was a "milestone" in Uta's career that would have had "positive implications" for her.

On September 26, 2011, the day before her body was discovered, Uta had a meeting with her supervisor and another coworker related to this new discovery, and they were all "quite enthusiastic" because "[t]his was one of the biggest discoveries [they] had had thus far in the laboratory." Later that evening, Uta attended one of the children's soccer games and was "in a great mood." She spread out a blanket and shared treats with other parents. Uta told a fellow parent that she "had been camping that weekend with her kids and [her boyfriend]" and was looking forward to her upcoming trip to California with her two youngest children later that week while Wall took the two eldest children to visit universities back east.

After the soccer game, Wall arrived at Uta's house to take the children back home. When he arrived, Uta tried to talk with him to finalize the details for the California trip, but Wall "rolled up his window and ignored her." According to the children, Wall appeared annoyed on the drive home.

With the children out of the house, Uta went about her usual Monday evening routine of "deep cleaning" the house. Uta called her boyfriend and made plans with him for the following night. At around 10:45 p.m., Uta spoke with a friend over the phone about potential plans for the next day. That was the last time anyone heard from Uta. September 27, 2011

The following morning, on September 27, 2011, Uta's neighbors did not see her at her kitchen table drinking coffee and reading her newspaper, as she did all other mornings. Instead, the newspaper remained in the driveway, and the garbage cans Uta put out for collection the night before remained on the street.

That same morning, Uta's eldest daughter awoke at around 6:00 a.m. and got ready for school. She searched the house for Wall, who usually drove her to the light rail station, but she could not find him anywhere. The eldest daughter testified that if Wall had to leave for the hospital in the middle of the night, he would "generally ... text [her] or call [her]" to let her know, but he had not left her any messages that morning. After calling him twice with no answer, the eldest daughter walked to the station to go to school. Wall was spotted by the eldest daughter's schoolmate and her mother at 7:05 a.m., driving some distance away from and in the opposite direction of his house, and Wall still had not returned home to get the youngest children ready for school by the time the eldest son left for school around 7:30 a.m. But the two youngest children remembered speaking with Wall at some point before leaving for school. Specifically, they remembered seeing an injury to Wall's eye. Wall told them that he had slept outside on the porch and had been scratched by their dog, but the youngest daughter thought Wall was acting "weird, almost paranoid." Just after 8:00 a.m., a carwash facility photographed Wall dropping off his car. Wall took his car there to "detail the inside" and asked the

carwash attendant to focus "extra heavy" in the trunk cargo area and on a spot on the driver's side back seat.

After leaving his car to be detailed, Wall arrived late for appointments with patients. He "looked disheveled and anxious," appeared not to have bathed, and wore the same clothes as the previous day. A medical assistant noticed that he had a scratch on the left side of his face and that his left eye was "reddened and bloodshot." Although two people who worked in Wall's office said that this scratch looked like it was caused by a fingernail, "Wall volunteered an explanation for the scratch, saying that his dog jumped on him and scratched his face while he was sleeping outside." One of the assistants "thought [this] explanation was odd because [Wall] had his dog for a long time and she had never seen it scratch him before." When Wall noticed that his assistant was looking at additional scratches on his arms, he "quickly" rolled down his sleeves. After seeing one patient, Wall left to see an eye doctor and did not return to work.

When the eldest children returned home, they too noticed the scratch to Wall's face and eye. Wall told them that he had been sleeping outside occasionally over the past few months and that their dog had scratched him the night before while he slept outside on the porch. None of the children had ever seen Wall sleep outside on the porch, and none of them knew their dog to scratch anyone.

*The Crime Scene*

At around 7:45 p.m. on September 27, 2011, Uta's boyfriend went to visit her as they had planned the night before. Uta's garbage cans were still on the street, and her newspaper was still in the driveway. The boyfriend walked into her house through her unlocked door, which Uta normally locked before going to bed. He noticed that her bathroom door was slightly ajar and that the light was on. On his way to the bathroom, he walked past her bedroom and noticed that the blinds, which were always open, had been pulled shut. The boyfriend reached the bathroom, announced his presence, opened the door, and found Uta dead in her bathtub with the cold water running but not overflowing. She wore only her pajama shorts, and her bloodied tank top was folded at the edge of the bathtub. The boyfriend called the police, who quickly arrived on the scene.

Upon entering the house, the first responders noted that there were pills strewn across the bedroom floor, a lamp had toppled over on the bed, and a vase and books from the nightstand had been knocked onto the floor. The comforter on the bed had been balled up in a way that appeared to conceal several dried bloodstains. The fitted bed sheet contained one large pool of blood and two smaller pools of blood that "show[ed] motion in three different directions," indicating "a sign of a real struggle." There was also a bloodstain on the pillowcase. In the bathroom, there was blood smeared on the sink and below the windowsill located above the bathtub, but there was no blood smeared on the walls between Uta's bedroom and bathroom or on any of the light switches. There was a shampoo bottle standing upright in the middle of the bathroom floor, which was usually kept in the windowsill above the bathtub. Under Uta's body, the first responders found a large kitchen knife. Also in the bathwater was a magazine, the sports section of the

6

newspaper (which Uta never read), and the youngest daughter's photo album. There were dried bloodstains that looked like shoeprints on the kitchen floor.

Some of the officers testified that the scene appeared "suspicious," as if "there could have been a struggle," and that it "did not appear consistent with an overdose or accidental death." After leaving the scene, one of the officers contacted detectives to conduct an investigation.

*Wall's First Version of the Events of*
*September 26 and 27*

Later that night, the detectives arrived at Wall's house to ask him "if he was willing to come down to [the] police station to talk." The officers did not tell Wall what they wanted to talk about, and he did not ask them.

While Wall waited to be interviewed, the detectives first interviewed the boyfriend. The boyfriend was "compliant" and "helpful." He did not "have any trouble time-lining himself, explaining what he had been doing the weekend before, [or what happened] the day before. He seemed to be honest in all of his answers."

In contrast, Wall's responses to the detectives' questions were vague and he spoke in generalities rather than directly answering questions about what occurred the previous night. When the detectives asked where he went the night before after picking up the children from Uta's house, Wall said, "I don't know ... I don't rem ... I mean, I don't usually remember every ... what I do, but ... ah ... usually what we do." (Omissions in original.) He went on tangents about what usually happened when he retrieved the children from Uta's house at the conclusion of her parent time. The officers kept redirecting Wall, stating, "So what happened last night, though, [Wall]? This was just last night." But Wall continued to respond to inquiries about the previous night with things the family "usually" did on Monday evenings or what the children "sometimes" did when they got back to Wall's house. Wall could not say if he had been home the entire night or if he had gone back to Uta's house after picking up the children. Wall evaded direct answers about the last time he had seen Uta, and he could not remember if he had recently touched Uta or the last time he had been inside Uta's house. When directly asked if he had been inside Uta's house on September 26 or 27, Wall responded, "I don't think so." When asked if there was "any reason, whatsoever, that [his] DNA ... would be under [Uta's] fingernails," Wall responded, "I don't know." When he was asked if he killed Uta, he said, "I don't think I did it," "I don't think I was there," and, "If I did it, I did make a mistake, and I am sorry. But I don't think I did it."

Eventually, over the span of three hours, Wall gave an account of the things he did on September 27, 2011. He told the detectives that he went to a gas station near his house to purchase eggs between 6:45 a.m. and 7:00 a.m. He said he returned to the house and had breakfast with his two youngest children before taking them to school. Wall then went to a carwash facility because he had "extra time" that morning and there were "burritos spilled all over" the front passenger seat. He talked about going to his office, seeing the eye doctor regarding the scratch on his eye—which he again said his dog caused—and returning to the carwash to get his car before driving to his office at the hospital. At the hospital, Wall apparently parked his car and left his windows rolled down with his cell phone still

inside the vehicle. He claimed that his cell phone had been stolen by the time he returned.

Wall could not tell the officers what he had done between 8:00 p.m. on September 26, 2011, and 6:45 a.m. the following day.

After interviewing Wall, the detectives had photographs taken of Wall's injuries and had a technician take his fingerprints. Wall was not arrested, and a detective arranged a ride home for him. One of the detectives testified at trial that Wall was "surprised" that he was being released and asked, "[S]o I'm not going to jail?" When the detective said he was not, Wall responded, "[B]ut I'm a monster."

*Wall's Conduct Following Uta's Death*

When Wall returned home from his interview with the detectives at around 2:30 a.m., he bluntly told the children, "Uta's dead and they think I did it." He told the youngest daughter "not to leave him alone because he was scared he would do something he would regret." Wall curled up "in the fetal position" and cried. He started "babbling and rambling" and "saying things along the line of: 'Am I a monster? Only a monster could have done this. How do I know what I do when I'm asleep? What if I did it and I don't remember?'" The children and family friends testified that Wall repeatedly referred to himself as a monster in the days following Uta's death. The eldest son explained that Wall's ramblings made him "question[ ] [Wall's] involvement in [his] mother's death."

One of the children called a family friend to help Wall. Wall told this friend, "Uta is dead and they think I did it ...." When she asked him, "[D]id you do these things that— that the police said you did?" Wall responded, "If I did them, I don't remember." When this friend started looking for some of Wall's medications, he told her that he had been "sleeping outside recently" and that "the dog scratched him on his face." She asked him, "Why are you telling me this?" And then he showed her his eye. The friend noticed other scratches and "gouges" on Wall's body, which he quickly covered up. Because Wall was so "distraught," the friend wanted to offer him a sedative and asked him if he was familiar with Xanax. Even though he was a medical doctor and had twice prescribed himself Xanax after his divorce from Uta, Wall claimed not to know what it was. After the friend explained Xanax's purpose, Wall claimed to remember recently prescribing his mother Xanax "because she's afraid to fly." Wall then started telling the friend that "[a]ll he wanted was for Uta to be happy ... and that's all he ever wanted," which the friend found to be "unusual because [she] felt like he was very angry at Uta" and did not believe that Wall really wanted her to be happy.

That same morning, Wall checked himself into a psychiatric facility where he stayed for about a week. While he was receiving treatment, the eldest son and a family friend visited him and asked him questions about Uta's death. During this conversation, Wall asked his son, "If the police found my phone there [at Uta's house,] what could I say to refute that?"

After Wall's release from psychiatric treatment, the children resumed living with him, but his behavior changed. Over time, Wall restricted the children's communication with Uta's family and the boyfriend. Wall told the children that the boyfriend should have "come to him and comforted him in his time of need," and

therefore the boyfriend should not be allowed to communicate with the children. (Emphasis added.) Wall also began telling his children that Uta committed suicide and told the youngest son, "[M]aybe it's better that she's dead." He became more "confrontational," "aggressive and intimidating" toward the children regarding Uta's death. The eldest son moved out of Wall's house the day after an "uncomfortable incident" in January 2012, in which Wall asked him "what [he] knew about [his] mom's death" and "what attorneys [he] had contacted." By May of that year, the three other children were also no longer living with Wall.

After Uta's death, the eldest son went to Uta's house to collect the children's photo albums to send them to Uta's family in Germany. He could not enter the house on his own because the spare key that was normally left outside for the children was missing and never found. After receiving help from the boyfriend to gain access to the house, the eldest son retrieved the albums and sent them to Germany. The eldest son informed Wall that he had sent the photo albums to Germany and that Wall would receive copies of the albums. In November 2012, Wall sued the eldest son for conversion and demanded to have the photo albums returned to him. In response, the eldest son filed a counterclaim against Wall for Uta's wrongful death.

*Wall's Second Version of the Events of*
*September 26 and 27*

At a hearing on the wrongful death claim, at which Wall was present, the lead detective testified that he was actively investigating Uta's death as a homicide and that Wall was the primary suspect. He further testified that "DNA samples had been submitted to [a] lab for testing" and that those results were still pending.

After this hearing, Wall was deposed and asked about his whereabouts between September 26 and 27. During his deposition, Wall offered new details to account for how his or Uta's DNA might have transferred to the areas tested by police. For instance, police took a swatch of fabric from the driver's side back seat where Wall had pointed out a spot at the carwash. Wall volunteered that, when he picked up the children from Uta's house the night before her death, Uta had opened the driver's side rear passenger door to hug the youngest daughter. Wall also claimed, for the first time, that he had caught Uta walking out of his garage later that night. Wall said he pursued Uta and "[s]he turned around and hit [him] in the face" and might have scratched him. He claimed that Uta had broken into his basement "multiple times in the previous months," but that he never reported it to the police.

Although the DNA results were still pending, counsel deposing Wall asked him, "Why is your DNA in Uta's bedroom?" He said he did not know if his DNA was there, but that Uta had invited him into her bedroom before "to seduce [him]," although he declined her advances. He could not remember when she last invited him into her bedroom but said that it could have been one or two months before her death.

Wall also testified in his deposition that Uta attempted suicide once on their honeymoon in 1991 and again while she was pregnant with their youngest son. But Wall said that he never reported either suicide attempt[2] or helped Uta seek counseling or treatment.

Wall claimed to have told Uta's father, but Uta's father had died before Uta and therefore could not corroborate this claim.

Finally, Wall gave a different version of events regarding his whereabouts on September 27, 2011, than what he told the detectives. This time, Wall explained that after allegedly chasing Uta away and being hit by her in the face, he went back inside his house to sleep. He woke up around 5:00 a.m. and decided to go to the hospital to work on his patients' charts but realized that he forgot his identification and could not enter the hospital. Wall said he decided to go for a hike up a nearby canyon before the sun rose and before going to the carwash facility and then to work. Unlike the story he told at his police interview, this version of events did not include Wall being at home that morning with the two youngest children and the newly purchased eggs before school, even though the youngest children testified to that effect.

*The Investigation*

While Wall was getting psychiatric treatment in September 2011, Uta's body was sent to a medical examiner to perform an autopsy. Although some of the officers believed there could have been foul play and that her death appeared suspicious, an investigator's report provided to the medical examiner said her death was "a probable suicide overdose." The medical examiner later testified that, had the "case been presented ... as a suspicious death or homicide," he would have taken more photographs of the body and conducted a more thorough examination. The medical examiner noted "sharp force injuries on her left wrist ... in three separate locations," a bruise on her lip, an abrasion on her cheek, and a laceration to her lower leg. Uta also had internal hemorrhages in her neck, which could have been sustained by a "broad and/or soft blunt object being applied in that location," and petechiae (burst capillaries) in her right eye, each of which were consistent with strangulation. Uta had a near-lethal dose of Xanax in her system, but there were no pill remnants in her stomach. The medical examiner was "not looking specifically for an injection site anywhere," because the case was brought to him as a probable suicide, but he testified that any of the injuries on Uta's body "could potentially obscure an injection site" if that was how the Xanax got into her system. The medical examiner explained that the nature of Uta's wounds was "not like anything [he] had ever seen in a suicide," because they appeared to be defensive rather than self-inflicted, and that he had concerns that the police were "dealing with a homicide."

After conducting the autopsy, the medical examiner concluded that Uta's cause of death was drowning but could not determine the manner of death. Based on his concerns that the manner of death may have been homicide, the medical examiner asked the officers to meet with him to discuss his findings. Because he could not determine how the Xanax got into her system, he asked the officers if they were conducting further investigation. The sergeant in charge of the case at that time "basically [said] that we think this is a suicide, period." The medical examiner told the officers that he was "not going to call this a suicide," and that the

manner of death was "undetermined" based on what he knew. The medical examiner explained that the scene of the crime was "suspicious," that it appeared "more consistent with homicide than anything else," and that "but for the Xanax" in Uta's system, he "would have certified the death as a homicide."

A few weeks after the medical examiner performed the autopsy, the investigation stalled. Between November 2011 and November 2012, the boyfriend, an ex-boyfriend, the eldest son, and some of Uta's other family members kept pressing the police to investigate the case as a homicide. Finally, in November 2012, the investigation resumed in earnest.

A crime scene reconstructionist reviewed the photographs taken by the investigators the night Uta's body was found, visited Uta's house after it had been cleaned, and reviewed the items collected from the scene. The reconstructionist determined that Uta had been murdered and that the murderer had staged the scene to look like a suicide. The reconstructionist, who had special training and expertise in "blood pattern interpretation," analyzed the blood patterns on Uta's comforter and fitted sheet and concluded that a "violent struggle" occurred and that Uta struggled "under a restraint." The reconstructionist also analyzed Uta's bloodied tank top that had been folded and laid over the side of the bathtub. Although there was one saturated spot on the chest where it appeared Uta had held her bleeding wrist against her body, there was "no hand transfer" of blood onto the tank top where one would expect to see it if Uta had removed the tank top herself. The reconstructionist opined that the bloodstains in the bathroom under the windowsill and on the sink appeared to have occurred while Uta was being pushed into the bathroom. The bloodstains were not consistent with Uta being "intoxicated and stumbling around her house on her own" because there were no apparent patterns on the walls of someone staggering or touching surfaces to get from the bedroom to the bathroom.

Forensic testing also revealed that there were bloody shoeprints in the bathroom and the bedroom and that there was a bloody spot above Uta's headboard. These blood stains initially went undetected because they had been cleaned up before the boyfriend discovered Uta's body and first responders arrived at the scene. A crime scene technician discovered these bloodstains using a special chemical that changes color when it comes into contact with blood protein, which helped to make the "partially visible" or "faint" bloodstains in the bedroom and on the bathroom floor more visible.

Unlike the faint bloodstains that were overlooked by the first responders, dried-blood shoeprints had been immediately apparent in Uta's kitchen. The crime scene reconstructionist explained that those stains would not have come from "rehydrated blood" because if the blood had dried and a person with a wet shoe stepped into the blood and started walking, that person "might get flakes ... [or] portions" of blood, but it would not make a full bloody shoeprint. The reconstructionist concluded that the evidence showed another person had been present and attacked Uta and that "this scene was a homicide that was staged to look like a suicide."

Investigators searched to find where the Xanax may have come from. Uta was never prescribed Xanax, she had never told anyone she had taken it, and no

prescription bottle for it was found at her house. Even though Uta sometimes stored her medication in film canisters, those canisters were always labeled. Further, Uta kept a yearly "medicine calendar" in which she dutifully documented the medications she took, the amount she took, and her "level of wellness" related to those medications. Nowhere on these calendars did Uta document taking Xanax.

On the other hand, Wall had twice prescribed himself .5 milligrams of Xanax following the divorce. And, just four months before Uta's death, Wall wrote a prescription for the highest dosage of immediate release Xanax, which is 2 milligrams, and filled that prescription at a pharmacy that he had never used before or since. Wall claimed that he filled this prescription for his mother who lived in California, but in their initial interviews with investigators, Wall's parents could not confirm whether they ever received such a medication.

At the crime scene, the investigators collected, among other things, a pillowcase and scrapings from underneath Uta's fingernails to be tested for DNA evidence. Using different techniques, investigators extracted DNA samples from each of these items. The forensic analysis revealed that Wall was a possible contributor to the DNA located on the pillowcase, but Wall could not be included or excluded as a possible contributor to the male DNA located under Uta's fingernails. Uta's ex-boyfriend, the boyfriend, and the first responders were all excluded as possible contributors to the DNA located under Uta's fingernails.

More than two years after Uta's death, the State charged Wall with murder. During the four-week jury trial, the State presented the evidence detailed above. The jury also heard, among other things, from two forensic pathologists who were given Uta's autopsy report with photographs, police reports, crime scene photographs, crime laboratory reports, photographs of Wall's face taken on September 27, 2011, the report from Wall's eye doctor, the preliminary hearing testimony of the medical examiner, and Uta's healthcare reports. Both agreed that Uta's wounds to her wrists and leg were not self-inflicted and were instead defensive wounds. They both determined that, although there was a near-lethal dose of Xanax in her system, the low level of Xanax in Uta's stomach was consistent with either the drug being injected into her body or swallowed as a slurry—meaning that the pills had been crushed and mixed with a liquid. Both of the forensic pathologists concluded that Uta's manner of death was homicide.

The jury convicted Wall of murder.

*State v. Wall*, 2020 UT App 36 ¶¶ 2-51, 460 P.3d 1058.

Petitioner appealed the conviction. In addition to claims Petitioner has since abandoned, the appeal included Petition's second cause of action, that trial counsel was ineffective for failing to object to statements about DNA made during closing arguments. While the appeal was pending, Petitioner' moved to remand the case to the trial court for evidentiary proceedings necessary to establish a record for additional claims of ineffective assistance of counsel.

*See* Utah R. App P. 23B. ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel.") The motion to remand included claims now presented as the first, third and fourth claims in the Petition.

The Court of Appeals denied the motion to remand. Order Denying Remand, *State v. Wall*, Case No. 20151017-CA (Utah Ct. App. May 22, 2018) (ECF No. 16-11.) With regard to Petitioner's first claim, the appellate court concluded that Petitioner's trial counsel had adequately addressed the DNA despite not independently testing the samples, and that additional testing would have merely presented the jury with a "battle of experts" rather than fully exonerating Petitioner. *Id*. 1-2. With regard to Petitioner's third claim, the Court of Appeals concluded that Petitioner's proposed alternative expert testimony related to the time of death amounted to "an assertion that appellate counsel would have called and retained different experts than those trial counsel decided to present to the jury. However, trial counsel's claims are not rendered ineffective just because appellate counsel would have taken a different course." *Id*. at 2. Finally, the Court of Appeals concluded the other proposed evidence did not support the conclusion that trial counsel had been ineffective and may have undermined trial counsel's defense strategy. *Id*. at 2-3.

The appellate court denied Petitioner's direct appeal. *State v. Wall*, 2020 UT App 36, 460 P.3d 1058. The decision only cites Utah cases but the Court of Appeals applied legal standards derived from and consistent with federal standards for ineffective assistance of counsel. *See, e.g., State v. Griffin*, 2015 UT 18, ¶15, 441 P.3d 1166 (citing *Strickland v. Washington*, 466 U.S. at 687).

The Court of Appeals ruled that relief could be granted only if a petitioner overcame the presumption that the challenged actions could be considered sound trial strategy. (ECF 16-11, at 1.) With regard to Petitioner's second claim, the court noted that Utah law affords wide latitude for closing arguments. *Id*. at ¶82 ("counsel for both sides have considerable latitude in their closing arguments. They have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports."). The court declined to decide whether the challenged statements by the prosecution were improper but noted that "the prosecutor correctly observed that male DNA was found under [the victim's] fingernail, not that [Petitioner's] DNA was underneath her fingernail, but essentially told the jury that the reasonable inference was that [Petitioner's] DNA was under [the victim's] fingernail." *Id. at* ¶ 83. The Court of Appeals determined that trial "counsel was not deficient in failing to object to the State's characterization of the fingernail-DNA evidence" because counsel chose instead to challenge the characterization in his own closing arguments. *Id*.

After his appeal was denied, Petitioner sought certiorari in the Utah Supreme Court. The petition for certiorari presented the following questions for review:

> **Question 1:** Did the court of appeals apply the wrong test for whether evidence is sufficient to support guilt beyond a reasonable doubt?
> **Question 2:** Does rule 23B require the court to accept as true a defendant's nonspeculative allegations and, except where the motion if [sic] facially deficient, either grant the motion or defer ruling on the motion until it rules on the merits?
> **Question 3:** Can a party satisfy the threshold showing of reliability under rule 702 where an expert admits the data he relies on is unreliable?
> **Question 4:** Where a district court before trial considers DNA evidence to be highly prejudicial if used to demonstrate the presence of the defendant, yet the prosecutor at trial repeatedly uses the evidence in precisely that manner, is counsel ineffective for failing to object?

Petition for Writ of Certiorari, *State v. Wall*, No. 20200365, 470 P.3d 444 (Utah Sup.Ct. 2020)

(ECF No. 16-12, at 11.) The petition for certiorari did not invite the Utah Supreme Court to

consider whether Petitioner's trial counsel had supplied ineffective assistance in the ways alleged in the first, third and fourth claims in the federal Petition. But the facts related to those claims were presented under Question 2, challenging the Court of Appeal's rejection of Petitioner's motion to remand. The facts and legal theory supporting the Petition's second claim were presented under Question 4. The Utah Supreme Court summarily denied certiorari. *State v. Wall*, 470 P.3d 444 (Utah Sup.Ct. 2020) (ECF No. 5, at 92.)

Petitioner declined to petition the United States Supreme Court to review the Utah Supreme Court's denial of his petition for certiorari. Nor did Petitioner seek habeas relief in the Utah state courts under the Utah Post-Conviction Remedies Act. ("PCRA"). Utah Code Ann. § 78B-9-106, *et seq*. (2025). Instead, Petitioner proceeded directly to file the petition under review.

### III. PROCEDURAL DEFAULT

#### A. Legal Standards for Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. §2254(b)(1), thereby giving the State the '"opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29, (2004) quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam). "The exhaustion requirement is designed to avoid the 'unseemly' result of a federal court 'upset[ting] a state court conviction without' first according the state courts an 'opportunity to . . . correct a constitutional violation.'" *Davila v. Davis*, 582 U.S. 521, 527 (2017) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). "To exhaust a claim, a state prisoner must pursue it through 'one complete round of the State's established appellate review process,' giving the state courts a 'full and fair opportunity' to correct alleged constitutional errors." *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). "[T]he prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of

discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. at 32.

Presenting a factual basis for a federal claim without articulating the relevant legal theory is insufficient to exhaust state remedies. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). "[F]air presentation does not require a habeas corpus petitioner to cite 'book and verse on the federal constitution.'" *Lovett v. Colo. State Penitentiary*, 2012 U.S. Dist. LEXIS 106259, *4-5 (quoting *Picard*, 404 U.S. 270, 278. (1971). However, "'[i]t is not enough that all the facts necessary to support the federal claim were before the state courts." *Id*. at 5 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry,* 513 U.S. 364, 365-366 (1995). "At bottom, 'the crucial inquiry is whether *the 'substance*' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." *Honie v. Powell*, 58 F.4th 1173, 1184 (10th Cir. 2023) (emphasis in original) (citations omitted).

The United States Supreme Court has declared that when a petitioner has "'failed to exhaust his state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of federal

habeas relief." *Thomas v. Gibson*, 218 F.3d 1213, 1221 (10th Cir. 2000) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

A petitioner has two opportunities to exhaust claims through the Utah Supreme Court: on direct appeal and through a collateral attack under the PCRA. Utah Code Ann. § 78B-9-106, *et seq*. (2025). However, there are limitations to claims that may be brought under the PCRA. The PCRA states in relevant part:

> A person is not eligible for relief under this chapter upon any ground that:
> (a) may still be raised on direct appeal or by a post-trial motion;
> (b) was raised or addressed at trial or on appeal;
> (c) could have been but was not raised at trial or on appeal;
> (d) was raised or addressed in any previous request for post-conviction relief or could have been, but was not, raised in a previous request for post-conviction relief; or
> (e) is barred by the limitation period established in Section 78B-9-107.

Utah Code Ann. § 78B-9-106(1). The PCRA bars claims filed more than one year after the cause of action accrues. Utah Code Ann. §78B-9-107(1) (2024) ("A petitioner is entitled to relief only if the petition is filed within one year after the day on which the cause of action has accrued.")

**B. Petitioner Failed to Exhaust his First, Third and Fourth Claims in State Court**

Petitioner did not afford the Utah Supreme Court a fair opportunity to review and correct his first, third and fourth claims of ineffective assistance of counsel. Petitioner's first, third and fourth claims are:

- Trial counsel failed to independently test DNA evidence using TrueAllele testing procedures. (ECF No. 1, at 29-34);

- Trial counsel failed to rebut the prosecution's theory of Petitioner's guilt by calling Dr. Peter Speth as a witness. *Id*. at 43-56;

- Trial counsel failed to introduce evidence showing that the victim sometimes deviated from her normal morning routine, that her neighbors' window provided an unobstructed

view of the victim's home and that the victim had once taken medicine which had "knocked [her] out." *Id*. at 56-63.

Petitioner presented these claims to the Utah Court of Appeal in his motion to remand for evidentiary proceedings. Petitioner's motion to remand clearly articulated the federal scope of the claims for the Utah Court of Appeals: "[t]he Sixth Amendment to the United States Constitution provides a criminal defendant with the right to the effective assistance of counsel at all stages of the criminal prosecution, including the investigation." Memorandum in Support of Rule 23B Motion, *State v. Wall*, No. 20151017-CA (July 26, 2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)) (ECF No. 16-9, at 35.)

Petitioner appealed the denial of his motion to remand in his petition for certiorari. Petition for Writ of Certiorari, *State v. Wall*, No. 20200365, (May 6, 2020) (ECF No. 16-12, at 11.) However, the petition for certiorari failed to alert the Utah Supreme Court to federal issues related to his motion to remand. The petition for certiorari describes the ways Petitioner believes his counsel was ineffective as alleged in his first, third and fourth claims. *Id*. at 21-26. Petitioner argued to the Utah Supreme Court that his "23B filings alleged 'specific facts and details' that together with the record evidence, 'demonstrate both deficient performance and prejudice.' Because [Petitioner's] allegations are nonspeculative, the 23B panel should have accepted them as true. But it did not." *Id*. at 22 (quoting *State v. Gallegos*, 2020 UT 19, ¶39-40, 463 P.3d 641). But the only legal question Petitioner presented to the Utah Supreme Court relevant to these claims was whether the appellate court had improperly reviewed his motion to remand under Utah law. *Id*. ("Does rule 23B require the court to accept as true a defendant's nonspeculative allegations and, except where the motion if [sic] facially deficient, either grant the motion or defer ruling on the motion until it rules on the merits?"). Assuredly, the question

presented to the Utah Supreme Court was a gateway to Petitioner's ineffective assistance of counsel claims. If the court had ruled in Petitioner's favor on the remand issue, Petitioner might have eventually exhausted his claims. However, the petition for certiorari cited no federal law, nor gave the Utah Supreme Court any direct indication that their decision on his motion to remand had the potential to close the gateway through which he intended to pursue federal claims. The Utah Supreme Court did not have a fair opportunity to correct the alleged ineffective assistance of counsel.

Petitioner cites *Nichols v. Sullivan* 867 F.2d 1250, 1252 (10th Cir. 1989) for the proposition that a "petitioner need not cite 'talismanic language' or 'book and verse on the federal constitution'" to exhaust a federal claim in state courts. (ECF No. 24, at 19.) In *Nichols v. Sullivan*, the Tenth Circuit held that a petitioner had exhausted a claim in the state supreme court even though his petition for certiorari did not expressly cite a federal basis for the claim. However, Petitioner's situation is more analogous to *Baldwin v. Reese*, in which the Supreme Court held that a petitioner had failed to exhaust some of his claims because he had failed to put the state supreme on notice that some of his claims of ineffective assistance of counsel were being raised under federal law.

In *Nichols v. Sullivan*, the Tenth Circuit concluded that a claim was exhausted because the petitioner had "put the [state supreme court] on notice that he raised a constitutional violation and provided that court an opportunity to consider the claim." *Nichols v. Sullivan*, 867 F.2d at 1253. The inmate's petition for certiorari to the state supreme did not expressly allege a federal basis for the claim; it only alleged that witness testimony "prejudicially violated a 'substantial right,' and that the 'administration of justice was tainted.'" *Nichols v. Sullivan*, 867 F.2d at 1252-3. However, the petitioner had filed a docketing statement with the state supreme court which

cited the Fifth Amendment due process clause as a basis for his claim. *Id*. The Tenth Circuit concluded that the state supreme court had adequate notice of the federal basis for the claim and the claim was exhausted. *Id*.

Petitioner's case is distinguishable from *Nichols v. Sullivan* in two respects. First, in *Nichols v. Sullivan* the petitioner's claim to the state supreme court was substantively similar to the claim asserted in federal court. In contrast, Petitioner did not afford the Utah Supreme Court an "opportunity to pass upon and correct" his allegations of ineffective assistance of counsel. *See Baldwin v. Reese*, 541 U.S. at 27 (quoting *Duncan v. Henry*, 513 U.S. at 365). Petitioner asked the Utah Supreme Court to review the Utah Court of Appeals' denial of a motion to remand under state law. Second, Petitioner has not identified a filing statement or any other document filed with the Utah Supreme Court which explicitly designated his claims as federal in scope.

Petitioner's situation is more analogous to *Baldwin v. Reese*, 541 U.S. 27 (2004). In *Baldwin,* a prisoner's petition to the state supreme court asserted claims of ineffective assistance by both trial and appellate counsel. *Id*. at 29. The petitioner's briefing neglected to designate some of his claims as federal in scope. The petition asserted that his "*trial* counsel's conduct violated several provisions of the *Federal* Constitution. But it did not say that his separate *appellate* 'ineffective assistance' claim violated *federal* law." *Id*. at 30 (emphasis in original). The Ninth Circuit ruled that the briefing provided adequate notice that the appellate claims were also raised under federal law because the state supreme court justices "had had 'the *opportunity* to read . . . the lower [state] court decision claimed to be in error before deciding whether to grant discretionary review." *Id.* at 30 (quoting *Reese v. Baldwin*, 282 F.3d 1184, 1194 (9th Cir. 2002)) (emphasis in original). The Ninth Circuit reasoned that if the state supreme court justices had

read the opinion of the lower state trial court, "the justices would have, or should have, realized that [the petitioner's] claim rested upon federal law." *Id*.

The United States Supreme Court rejected the Ninth Circuit's expansive interpretation of the fair presentation standard:

> [T]o say that a petitioner "fairly presents" a federal claim when an appellate judge can discover that claim only by reading lower court opinions in the case is to say that those judges *must* read the lower court opinions--for otherwise they would forfeit the State's opportunity to decide that federal claim in the first instance. In our view, federal habeas corpus law does not impose such a requirement.

*Id*. at 31 (emphasis in original). The Supreme Court held that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id.* at 32.

Similar to *Baldwin*, Petitioner's briefing to the state court of appeals clearly identified all of his claims to be federal in scope. And, Petitioner's briefing to the state supreme court designated one, but not all, of his claims of ineffective assistance of counsel as "constitutional" in scope. The Utah Supreme Court might have discerned the federal scope of Petitioner's additional claims from his motion to remand if they had reviewed his filings in the lower courts. However, Petitioner's argument for exhaustion is even less compelling than the prisoner in *Baldwin*. Unlike the prisoner in *Baldwin*, Petitioner never presented the state supreme court a direct opportunity to consider the substance of his first, third and fourth claims of ineffective assistance of counsel. Petitioner asked the Utah Supreme Court only to clarify state law pertaining to a motion to remand. Petitioner's situation is more analogous to *Baldwin*, than *Nichols*.

*Baldwin* held that principles of comity preclude a requirement by federal courts that state supreme courts consider filings to lower courts when ruling on a discretionary petition for certiorari. *See Baldwin v. Reese*, 541 U.S. 27, 31 (2004). Petitioner's citation to *Nichols v. Sullivan* for the proposition that a petitioner need not cite talismanic language to put state courts on notice of a federal claim is inapposite. Petitioner failed to afford the Utah Supreme Court fair notice that he asserted his first, third and fourth claims under federal law.

Petitioner argues that his citation to *State v. Gallegos*, 463 P.3d 641, (Utah 2020) alerted the Utah Supreme Court to the federal scope of his claims because *Gallegos* applies a standard for ineffective assistance of counsel modeled after the federal *Strickland* standard. (ECF No. 24, at 21.) *Gallegos* does apply the standard for ineffective assistance of counsel under Utah law, and does cite *Strickland*. *Gallegos*, at ¶33, (quoting *Menzies v. State*, 2014 UT 40, ¶ 75, 344 P.3d 581) ("In an ineffective assistance of counsel claim, we employ the two-part test *Strickland* established, 'which requires the defendant to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.'"). But Petitioner did not cite *Gallegos* for that proposition. The following passage contains Petitioner's only reference to *Gallegos* in the petition for certiorari:

> Under Rule 23B, a defendant must set forth "nonspeculative" allegations that "if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B. So long as the allegations are nonspeculative, the court must accept the allegations as true. And a defendant sets forth nonspeculative allegations when he "submit[s] specific facts and details that relate to specific relevant occurrences" rather than relying on generalizations or "speculat[ing] about what a remand might uncover." *State v. Gallegos*, 2020 UT 19, ¶ 40, --- P.3d --- (internal quotation marks omitted).

(ECF No. 16-12, at 22 (quoting *Gallegos*, at ¶40).) Petitioner's citation to *Gallegos* did not provide adequate notice to the Utah Supreme Court that he pursued his first, second and third claims under federal law.

Petitioner failed to present his first, second, and third claims to the Utah Supreme Court in a manner that gave the Utah Supreme Court fair notice Petitioner wished to pursue those claims under federal law. Nor did Petitioner present the Utah Supreme Court with an opportunity to correct the alleged failure. Accordingly, Petitioner failed to exhaust his first, third and fourth claims of ineffective assistance of counsel.

### C. Petitioner's Unexhausted Claims are Procedurally Defaulted

When a petitioner has "'failed to exhaust his state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Thomas v. Gibson*, 218 F.3d 1213, 1221 (10th Cir. 2000) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). A petitioner has two opportunities to exhaust claims through the Utah Supreme Court: on direct appeal and through a collateral attack under PCRA. Utah Code Ann. § 78B-9-106, *et seq*. (2025).

Petitioner did not file a state petition for post-conviction relief under the PCRA and would now be time-barred from filing such a claim. The PCRA bars claims filed more than one year after the cause of action accrues. Utah Code Ann. §78B-9-107(1) (2025) ("A petitioner is entitled to relief only if the petition is filed within one year after the day on which the cause of action has accrued."); *Patterson v. State*, 2021 UT 52, ¶ 15, 504 P.3d 92.

Petitioner had until October 12, 2021, to file a state petition for post-conviction relief under the PCRA. *See* Utah Code Ann. §78B-9-107(1) (2025). Petitioner's cause of action to file a PCRA claim accrued on the last day to file a petition for writ of certiorari in the United States Supreme Court. *See* Utah Code Ann. § 78B-9-107 (2025) ("For purposes of this section, the cause of action accrues on the last day for filing a petition for writ of certiorari in the … United

States Supreme Court, if no petition for writ of certiorari is filed."). The Utah Supreme Court denied certiorari review of Petitioner's direct appeal on July 14, 2020. (ECF No. 5, at 92.) Petitioner's conviction became final after his opportunity to petition the United States Supreme Court to review his direct appeal expired on October 13, 2021. *See* U.S. Sup. Ct. R. 13(1) ("A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review.") Petitioner did not file a petition for habeas relief under the PCRA in the state courts and the time period has now expired. Petitioner's first, third and fourth claims are procedurally defaulted.

## IV. FEDERAL EXCEPTION TO PROCEDURAL DEFAULT

Federal courts may excuse procedural default if a petitioner can demonstrate either cause and prejudice or a fundamental miscarriage of justice. A federal court "may not consider issues raised in a habeas petition 'that have been defaulted in state court on an independent and adequate procedural ground[] unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.'" *Thomas*, 218 F.3d at 1221 (quoting *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998) (alteration in original)). Petitioner "concedes that there was no cognizable cause for any procedural default." (ECF No. 24, at 24.) However, Petitioner argues that any procedural default should be excused because his conviction results in a fundamental miscarriage of justice. *Id*. Petitioner fails to marshal evidence necessary to meet the standard for exception to procedural default.

### A.  Legal Standards for Miscarriage of Justice

A petitioner may overcome the procedural bar if he can show that his conviction resulted in a "fundamental miscarriage of justice." *See Thomas*, 218 F.3d at 1221 (alteration omitted)

(citation omitted). A "fundamental miscarriage of justice" means that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). The Supreme Court has described this exception as being "concerned with actual as compared to legal innocence." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). To qualify for the miscarriage of justice exception, a petitioner must show that "in light of new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386-87 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)); *Fontenot v. Crow*, 4 F.4th 982, 1030 (10th Cir. 2021) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006) ("A petitioner's burden at the gateway stage is to demonstrate 'that more likely than not any reasonable juror would have reasonable doubt.'"). The standard requires an applicant to "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324 (1995); *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (citing *Schlup,* 513 U.S. at 324); *Hale v. Fox*, 829 F.3d 1162, 1171 (10th Cir. 2016) (citing *McQuiggin v. Perkins*, 569 U.S. 383 (2013)) ("A prisoner can establish actual innocence in post-conviction proceedings only by bringing forward new exculpatory evidence."). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House v. Bell*, 547 U.S. 518, 538 (2006). The actual innocence standard is demanding and will be met only in an extraordinary case. *Id*. Because such evidence is so rare, "in virtually every case, the allegation of actual innocence has been summarily rejected." *Calderon v. Thompson*, 523 U.S. at 559 (citation omitted).

**B. Petitioner Fails to Establish a Fundamental Miscarriage of Justice**

Petitioner offers three categories of evidence arguments to support the claim that his conviction results in a fundamental a miscarriage of justice. First, Petitioner argues that "new DNA evidence excludes Petitioner from the DNA deposits found at the scene and fully undermines the speculative evidence to the contrary presented at trial." Second, Petitioner argues that testimony by an additional expert witness would disprove the Prosecution's estimate of time of death. Third, Petitioner identifies miscellaneous evidence to support his actual innocence. The likely impact of Petitioner's new evidence on reasonable juror's falls short of the standard to establish a miscarriage of justice. Petitioner has not met his burden to show that "in light of new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *See McQuiggin*, 569 U.S. at 386-87 (quoting *Schlup,* 513 U.S. at 329).

**1. Petitioner's new DNA evidence**

Petitioner argues that new testing performed on some of the DNA samples collected at the scene "fully undermines the speculative evidence" presented at trial. (ECF No. 24, at 27.) Petitioner overstates the impact of the new testing. The new DNA evidence does not substantially alter the total evidentiary picture against Petitioner. The DNA evidence presented at trial was inconclusive, and it remains inconclusive. The prosecution presented extensive circumstantial evidence of Petitioner's guilt but could not establish conclusive evidence placing Petitioner at the crime scene at the time of the murder. The new DNA evidence eliminates one possible strand of evidence linking Petitioner to the crime scene. But in light of the totality of evidence adduced at trial, including Petitioner's evolving explanations about the possibility that his DNA would be discovered at the scene, the new evidence fails to show that Petitioner's conviction results in a fundamental miscarriage of justice.

Investigators collected multiple DNA samples at the crime scene, including multiple samples from the victim's bedding and a tiny amount of DNA recovered from under the victim's fingernail. Test results suggested that the DNA recovered from the victim's bedding could have belonged to members of Petitioner's paternal line, including his sons. Petitioner's trial counsel argued that the DNA did not place Petitioner at the scene of the crime because it also could have come from Petitioner's sons, who live in the home and were more likely to have deposited the DNA.

New testing vindicates Petitioner's trial counsel's argument about the origin of DNA on the victim's bedding. The new testing shows that the samples collected from the bedding included DNA from both the victim's son as well as her boyfriend but did not come from Petitioner. (ECF No. 24, at 33.) Nevertheless, the new testing falls short of the type of evidence necessary to undermine confidence in Defendant's conviction. Petitioner must show that in light of the new evidence, no reasonable juror would have found him guilty beyond a reasonable doubt. *See, e.g., House v. Bell*, 547, U.S. at 538. A reasonable juror presented with the new evidence that Petitioner did not contribute to the DNA samples collected on the victim's bedding could still reasonably conclude that Petitioner is guilty beyond a reasonable doubt. See *McQuiggin*, 569 U.S. at 386-87 (quoting *Schlup,* 513 U.S. at 329).

The prosecution encouraged the inference that Petitioner was the source of DNA recovered from the victim's bedding, but the test results presented at trial were inconclusive. The prosecution also presented other evidence that Petitioner was at the scene of the crime on the night of the murder. Shortly after the victim's body was discovered Petitioner asked one of his children, "If the police found my phone there [at Uta's house,] what could I say to refute that?" *State v. Wall*, 2020 UT App 36 at ¶30. Further, the inference that Petitioner was the source of the

DNA was supported by Petitioner's own statements. For example, before the test results were returned, but long after he was first interviewed by police, Petitioner was deposed in the wrongful death lawsuit. Petitioner acknowledged that his DNA might be discovered at the scene of the crime. *State v. Wall*, 2020 UT App 36, ¶ 68. In the deposition, Petitioner claimed (apparently for the first time) that the victim had tried to seduce him in her bedroom, and that she had slapped him in the face the night before she died. *Id.* These admissions are particularly inculpatory when considered in light of the scratches on his face after the murder and when contrasted to Petitioner's original responses on the night the victim's body was discovered. When police originally asked Petitioner where he was the night before

> he responded with equivocal statements such as "I don't know, I don't think I did it," "I don't think I was there," and "If I did it, I made a mistake, and I am sorry. But I don't think I did it." When [Petitioner] was released after the interview, he was surprised and said, "[B]ut I'm a monster."

Id. at ¶ 66. Even though new testing has shown that Petitioner was not the source of the DNA discovered on the victim's bedding, Petitioner has offered explanations for why his DNA might have been discovered at the scene of the crime, including under the victim's fingernail, which was never affirmatively matched to his, and could not be retested.

A reasonable juror presented with the new DNA evidence could still conclude that the totality of evidence supports a finding that Petitioner is guilty beyond a reasonable doubt. At trial, there was no definitive proof placing Petitioner in the victim's home on the night of the murder, and there remains none. But compelling circumstantial evidence of Petitioner's guilt persists, including Petitioner's own statements; the presence of indeterminate male DNA under the victim's fingernail; scratches on Petitioner's face; and possible defensive wounds on the body. Further, the victim's lack of symptoms of mental illness, recent professional success, and positive personal relationships can reasonably be viewed as inconsistent with the defense theory of

accidental or intentional suicide. The new DNA evidence falls far short of establishing that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. A reasonable juror could conclude that Petitioner's erratic and suspicious behavior, both before and after the murder, is convincing evidence of his guilt beyond a reasonable doubt.

## 2. Washer woman changes

Petitioner argues that new evidence regarding the "washer woman" effect establishes that the prosecution was mistaken about the victim's time of death, meaning that Petitioner had an alibi when the victim actually died. (ECF No. 24, at 27.) According to Petitioner's expert witnesses, washer woman changes are the progressive wrinkling of the skin as it absorbs water which become permanent on a corpse after five to six hours of submersion, depending on factors including water temperature, salinity and skin thickness. (ECF No. 5, at 194-7.)

The prosecution estimated the time of death between 10:00 pm on September 26, and 6:30 am September 27, a period for which Petitioner has offered conflicting accounts about his whereabouts and cannot establish an alibi. The prosecution called Dr. Marcella Fierro to establish the time of death. Dr. Fierro testified that she had performed autopsies on thousands of individuals, including hundreds of drowning victims. Dr. Fierro based the estimated time of death on a variety of factors, including rigor mortis, lividity and the victim's medical history. Dr. Fierro identified what she described as washer woman changes depicted in photos of the victim's skin taken several hours after she had been removed from water. Dr. Fierro testified that the victim's washer woman changes manifest as a "fine wrinkly pattern and . . . pale and whitish . . . toes" because of the victim's thin skin. Dr Fierro contrasted the washer woman effects on the victim's skin with more calloused skin in one of the exhibits: "you are not ever going to get big

wrinkles in this lady's surface because her skin is thin and its not heavily calloused." However, she also testified that she would not use washer woman changes to establish a time of death.

In rebuttal, the defense called Dr. Judy Melinek, a forensic examiner who testified that she did not observe washer woman changes in the photographs of the victim's body, and the lack thereof proves that she could not have been in the water more than five or six hours prior to being discovered at around 8:00 pm. Dr. Melinek cited peer reviewed scientific research on washer woman changes to support her testimony. Based on Dr. Melinek's testimony, the defense argued that Petitioner could not have killed the victim because he had an alibi after 6:30 am that morning.

Petitioner now seeks to offer additional rebuttal to Dr. Fierro's testimony with testimony from another forensic pathologist, Dr. Peter Speth. Dr. Speth, had been retained by trial counsel and was prepared to testify at trial. However, for reasons irrelevant to this inquiry, trial counsel chose to use Dr. Speth only as a consultant and relied solely on Dr. Melinek for testimony. Petitioner highlights two arguments Dr. Speth could offer that were not presented at trial. First, Dr. Speth would offer additional insight into washer woman changes as supported by scientific literature, including the fact that "thin skin is more rapidly affected by washer woman changes than thick, brawny calloused skin." (ECF No. 24, at 35.) Second, Dr. Speth would testify that the scientific literature supports the use of washer woman changes to establish time of death in a drowning victim. *Id*.

The new evidence pertaining to washer woman changes amounts to another salvo in the battle of experts that confronted the jury at trial, but is not the type of reliable scientific evidence necessary to demonstrate a fundamental miscarriage of justice. At trial, the prosecution's expert witness offered an opinion as to the time of death based on her experience with hundreds of

drowning deaths and thousands of autopsies. The opinion factored a variety of factors, one of which was the presence of what she described as washer woman changes in the victim's skin. Dr. Fierro identified what she described as washer woman changes in photos of the victim's body. The defense expert offered a contrary opinion. The witness for the defense testified that the lack of washer woman changes in the photos indicate that the victim could not have died more than five or six hours prior to her discovery. The jury was able to compare photos of the victim with photos of other bodies that had been submerged in water.

Petitioner argues that "Dr. Speth demonstrates that not only does the photograph taken of the corpse fail to support [Dr.] Fierro's assertion, but that [Dr.] Fierro's assertion is unsupported by the literature and the science." (ECF No. 24, at 35.) Petitioner's argument fails on multiple fronts. First, Dr. Melinek already testified that the photographs of the victim were inconsistent with washer woman changes as described in the scientific literature. Dr. Speth might have articulated the argument differently, but the essence of Dr. Speth's testimony was already presented to the jury. Furthermore, the jury could compare the photos with the victim with other photos depicting washer woman changes and could reach their own conclusion as to whether the photos supported Dr. Fierro's testimony. Even if the scientific literature supports the use of washer woman changes to establish time of death, Dr. Fierro based her opinion on a variety of scientific factors.

Petitioner's argument that Dr. Fierro "misstated the science when she suggested that [the victim's] thin skin would not manifest washer woman changes" also fails. Petitioner mischaracterizes Dr. Fierro's testimony. Dr. Fierro did not suggest that the victim's skin would not manifest washer woman changes; Dr. Fierro testified that washer woman changes manifest differently on thin skin than on calloused skin. Dr. Fierro even identified what she described as

washer woman changes in photos of the victim. Dr. Melinek offered her opinion that Dr. Fierro was incorrect about the presence of washer woman changes. Dr. Speth's testimony that thin skin develops washer woman changes comparatively faster than thin skin is arguably consistent with Dr. Fierro's testimony that washer woman changes manifests differently in thin versus calloused skin.

Dr. Speth's testimony is not the type of reliable scientific evidence necessary to overcome the demanding standard for a fundamental miscarriage of justice. A reasonable juror confronted with the totality of evidence, including Dr. Speth's proposed testimony, could still reasonably find Petitioner guilty beyond a reasonable doubt.

### 3. Miscellaneous evidence of the Victim's instability

Finally, Petitioner argues that miscellaneous additional evidence supports his claim of actual innocence. None of the proffered evidence is the type of "reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" upon which a claim of actual innocence may be based. *See Schlup v. Delo,* 513 U.S. 298, 324 (1995). Petitioner highlights three additional pieces of evidence to support his actual innocence.

First, Petitioner cites an email exchange between the victim and her boyfriend approximately one month before she died. In the exchange the victim said she had felt ill and slept until around 8 o'clock one morning. The victim wrote "I love the warm summer nights and the work-freedom to stay up and do what I want." According to Petitioner, this contradicts the prosecution's theory that the victim must have been dead by 6:30 am because she "always" woke early.

Next, Petitioner offers testimony of a private investigator who went to the victim's neighbor's house to confirm that it was possible for a person standing at the neighbor's window

to see whether a light were on in the victim's bathroom. Petitioner argues that this testimony proves his actual innocence because, at trial the neighbor testified that he did not notice a light on in the victim's house early in the morning of the day the victim was discovered. The victim's boyfriend testified that he did observe a light on prior to entering the house that evening. Petitioner argues that "if these two witnesses are accurate, someone turned on the light and that person could not have been Petitioner." (ECF No. 24, at 38.)

Finally, Petitioner argues that "[c]ontrary to the evidence at trial that [the victim] did not take medications that altered her mental state, new evidence shows that she voluntarily took medications that knocked her out." (ECF No. 24, at 39.) Petitioner cites an email exchange in which the victim told her boyfriend that she had once been "knocked out" when she took Benadryl from Costa Rica which was more concentrated than her normal dosage. (ECF No. 5, at 167.) Petitioner argues that this email amounts to evidence rebutting the state's theory that the victim did not abuse mind-altering drugs. (ECF No. 24, at 39.)

The proffered evidence, both individually and cumulatively, is not the type of reliable evidence necessary to support Petitioner's claim of actual innocence. A court must "make a probabilistic determination about what reasonable, properly instructed jurors would do" if presented with the new evidence. *Schlup*, 513 U.S. at 329 ("it is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.") Petitioner has not met his burden "to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely

than not any reasonable juror would have reasonable doubt" of Petitioner's guilt. *See House v. Bell*, 547 U.S. at 538.

A reasonable juror is not likely have been swayed by evidence that one morning when she was feeling nauseous, the victim slept until 8 am, nor that she expressed her gratitude for the freedom to stay up late on warm summer nights. Nor does the victim's reference to the effects of an unusually high dose of Benadryl support an inference about abuse of mind-altering drugs or her mental state around the time of her death. Finally, Petitioner's evidence that the victim's neighbor would have had an unobstructed view into the victim's backyard to observe whether a light was on in the victim's bathroom is not the type of reliable exculpatory evidence upon which a fundamental miscarriage of justice may be based. Even if the neighbor *could* have seen into the victim's backyard, the neighbor might not have noticed the light or register its significance on the morning of the victim's death.

In light of the totality of evidence, including the new evidence and the evidence presented at trial, none of Petitioner's new evidence is sufficiently exculpatory that it would tip the balance of probabilities that a jury would have found Petitioner guilty beyond a reasonable doubt. Therefore, Petitioner does not qualify for an exception to Procedural default.

## IV. PETITIONER FAILS TO ESTABLISH THAT HIS TRIAL COUNSEL WAS CONSTITUTIONALLY DEFICIENT FOR FAILING TO OBJECT TO THE PROSECUTION'S CLOSING STATEMENT

Petitioner alleges that his trial counsel was "constitutionally deficient in failing to object to the prosecutor's repeated mischaracterization of the DNA evidence."[1] (ECF No. 16-12, at 28.)

---

[1] Both the United States Constitution and Article I section 12 of the Utah Constitution guarantee the right to effective counsel. See *State v. McDonald*, 922 P.2d 776, 779 (Utah Ct. App. 1996). Petitioner's briefing to the Utah Supreme Court neglected to clarify whether he asserted the claim under the Utah constitution, the federal constitution or both. Nevertheless, Respondent concedes that Petitioner exhausted this cause of action. In light of that concession, Petitioner's second claim is examined on the merits.

A federal court may grant a habeas corpus application arising from a state-court adjudication on the merits of a claim if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The Utah Court of Appeals rejected this claim on the merits on direct appeal. The Utah Supreme Court summarily denied certiorari. Respondent concedes that Petitioner exhausted this claim in the Utah courts. Therefore, the merits of Petitioner's second cause of action will be reviewed.

## A. Background

Prior to trial, the state collected several DNA samples from the victim's home. The samples included three (male) skin cells recovered from under the victim's fingernail. *State v. Wall*, No. 131903972, dkt no. 378, p. 2 (February 9, 2015). The small amount of DNA allowed the prosecution to exclude certain individuals as the source of the skin cells, but Petitioner could neither be included or excluded. *Id*. at 2-3.

Petitioner's trial counsel filed a motion in limine asking the court to exclude the fingernail DNA evidence. The motion argued that because there was insufficient material to make a meaningful comparison between the skin cells and Petitioner's DNA, evidence derived from the skin cells was not probative of Petitioner's guilt and would create undue prejudice. The trial court deemed the evidence admissible, reasoning that the presence of the male DNA under the victim's fingernails could inform the jury's evaluation of the defense theory that the victim's death was intentional or accidental suicide. *Id.* at 7. The trial court also suggested that the results could help the jury decide whether various male individuals who had relevant contact with the victim or her body had been involved in her death. *Id*. at 7-8. The court highlighted that the male DNA under the alleged victim's fingernail was "particularly relevant in connection with the State's evidence

that on the day the alleged victim died, Defendant had a scratch on his face consistent with a human nail and made inconsistent statements regarding the scratch." *Id.* at 7. Still, the court issued a warning that "if the State or its witnesses encourage the inference that Defendant is included as a possible contributor to [the fingernail sample] based upon the test results, the court will consider offering a curative instruction to the jury." *Id*.

During closing arguments, the prosecutor stated "we have male DNA being found under [the victim's] right-hand fingernail clippings. I would submit to you it was as if [the victim] was standing in this courtroom and pointing to [Petitioner] as her killer." Petitioner argues that this statement violated the court's order on the motion in limine and that trial counsel was constitutionally deficient in failing to object.

The Utah Court of Appeals analysis of Petitioner's claim conformed to the *Strickland* standard. *State v. Wall*, 2020 UT App 36 ¶ 81 ("To prove that trial counsel was ineffective, Wall must show that trial 'counsel's performance was deficient, in that it fell below and objective standard of reasonable professional judgment,' and 'that counsel's deficient performance was prejudicial.' *State v. Litherland*, 2000 UT 76 ¶ 19, 12 P.3d 92; *see also Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984).")

The Court of Appeals concluded that Petitioner had failed to show that his counsel performed deficiently and rejected the claim.

> The prosecutor correctly noted that male DNA was found under [the victim's] fingernail, not that [Petitioner's] DNA was underneath her fingernail, but essentially told the jury that the reasonable inference was that [Petitioner's] DNA was under [the victim's] fingernail. Assuming without deciding that this statement was improper, trial counsel may have based his decision to forgo an objection on sound trial strategy, choosing instead to undermine the State's characterization of the fingernail-DNA evidence in his own closing argument. This is exactly what trial counsel did. Trial counsel argued that the DNA evidence was "just meaningless," it "doesn't prove anything" because Wall was excluded as a possible contributor to some of the DNA samples, the DNA test results were "unreliable," and the DNA

evidence "doesn't put [Petitioner] in [the victim's] house" We therefore conclude counsel was not deficient in failing to object to the State's characterization of the fingernail-DNA evidence.

Id. at ¶ 83. The court cited *State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980 for the proposition that counsel performs deficiently only where there is no "conceivable tactical basis for counsel's actions." The Utah Supreme Court summarily denied certiorari. *State v. Wall*, 470 P.3d 444 (Utah Sup.Ct. 2020) (ECF No. 5, at 92.)

### B. Legal Standard

Federal courts apply *Strickland*'s familiar two-pronged standard to claims of ineffective assistance of counsel. Under *Strickland*, a petitioner must show (1) deficient performance by counsel, measured by a standard of "reasonableness under prevailing professional norms;" and, (2) prejudice to the defense caused by that deficient performance. *Strickland,* 466 U.S. at 687-88. The prejudice element requires showing errors were so grave as to rob the petitioner of a fair proceeding, with reliable, just results. *Id.* "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. at 104 (quoting *Strickland,* at 688). However, the question before a federal court reviewing claims of ineffective assistance of counsel in a habeas petition "'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable --a substantially higher threshold.'" *Knowles v. Mirzayance, 556 U.S. 111, 123, (2009) (quoting, Schriro v. Landrigan,* 550 U.S. 465, 473 (2007)). *Williams v. Taylor*, 529 U.S. 362, 389 (2000) defines "unreasonable" as used in 2254(d) to refer to "cases in which, at first-blush, a state-court judgment seems entirely reasonable, but thorough analysis by a federal court produces a firm conviction that that judgment is infected by constitutional error."

### C. Analysis

The federal statute tightly curbs review. The Utah Court of Appeals' analysis conforms to the *Strickland* standard. *See State v. Wall*, 2020 UT App 36, ¶ 81 ("To prove that trial counsel was ineffective, Wall must show that trial 'counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment,' and 'that counsel's deficient performance was prejudicial."). The court of appeals concluded that trial counsel had adequately confronted the prosecution's statements about the fingernail-DNA in his closing remarks rather than making an immediate rejection. The court of appeals summarized the relevant portions of trial counsel's closing remarks.

> Trial counsel argued that the DNA evidence was "just meaningless," it "doesn't prove anything" because Wall was excluded as a possible contributor to some of the DNA samples, the DNA test results were "unreliable," and the DNA evidence "doesn't put [Petitioner] in [the victim's] house."

*State v. Wall*, 2020 UT App 36, ¶83. Petitioner argues that the court of appeals' decision involved an unreasonable application of clearly established federal law because "the state court decision ignored a critical fact – trial counsel *did not address* the fingernail DNA evidence in his closing argument." (ECF No. 24, at 52) (emphasis in original).

The court of appeals reasonably interpreted trial counsel's generalized arguments about the DNA evidence to adequately address the fingernail-DNA. *See Harrington v. Richter*, 562 U.S. 86, 104, 131 S. Ct. 770, 787 (2011) ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") Trial counsel may have strategically chosen to address the DNA evidence in general terms because highlighting the fingernail DNA risked undermining the defense that the victim's death was the result of accidental or intentional suicide. The presence of DNA under the victim's fingernail suggested the possibility of a struggle and was particularly

damaging if it was associated with the scratches on Petitioner's face. Reasonably competent counsel might have wished to avoid reinforcing that connection.

Furthermore, reasonably confident counsel could not be certain that an objection would have been sustained. Utah law affords attorneys "considerable latitude in their closing arguments." *State v. Wall*, 2020 UT App 36, ¶ 82 (quoting *State v. Houston*, 2015 UT 36, ¶ 76, 353 P.3d 55). The order in limine cautioned the prosecution not to encourage the inference that Petitioner was "included as a possible contributor to [the fingernail sample] *based upon the test results." State v. Wall*, No. 131903972, dkt no. 378, p. 7 (February 9, 2015) (emphasis added). A statement to the jury that Petitioner's DNA matched the fingernail sample at all five testable alleles would have presented a clear violation of the order in limine. But the order specifically acknowledged the possible relevance of male skin cells under the victim's fingernails in the context of the scratches on Petitioner's face shortly after the murder. *Id.* As the Court of Appeals pointed out, "the prosecutor correctly noted that male DNA was found under [the victim's] fingernail, not that [Petitioner's] DNA was underneath her fingernail, but essentially told the jury that the reasonable inference was that [Petitioner's] DNA was under [the victim's] fingernail." *State v. Wall*, 2020 UT App 36, ¶ 83. The Court of Appeals assumed without deciding that the prosecution's statement was improper. *Id*. Nevertheless, because the statement conformed to the narrowest reading of the order in limine, trial counsel could not have been certain that an objection would have been sustained. If trial counsel had made immediate objection to the prosecution's statements, and the objection were overruled, the objection could have signaled to the jury that the fingernail-DNA was particularly damaging to Petitioner, further undermining Petitioner's primary defense.

The Utah Court of Appeals reasonably applied the *Strickland* standards in concluding that trial counsel had not been ineffective by declining to object to prosecution's statement about fingernail DNA in closing arguments. Petitioner's trial counsel's representation was within the "wide range of reasonable professional assistance" required by the United States constitution. *See Harrington v. Richter*, 562 U.S. at 104. Therefore, Petitioner's second claim is dismissed on the merits.

## V. CONCLUSION

Petitioner's claims are either procedurally defaulted or do not satisfy the federal habeas standard of review.

**IT IS THEREFORE ORDERED** that the petition for writ of habeas corpus is **DENIED** and the action **DISMISSED WITHOUT PREJUDICE**.

**IT IS ALSO ORDERED** that a certificate of appealability is **DENIED**.

This action is **CLOSED**.

DATED this __28__ day of May, 2025.

BY THE COURT

_____
JUDGE DAVID NUFFER
United States District Court

40